**STABLER et v A G PETERSON & McDONALD-COOLIDGE & CO**

(4 Cases)

Ohio Appeals, 2nd Dist, Shelby Co

Nos 103, 104, 105 & 106.

Decided April 23, 1937

A. G. Hahn, Quincy, for plaintiffs.

Calfee & Fogg, Cleveland, and H. K. Forsythe, Sidney, for McDonald-Coolidge & Co.

## OPINION

By THE COURT

The above-entitled cases are now being determined on appeal on questions of law and fact from the judgment of the Court of Common Pleas of Shelby County, Ohio.

By agreement of counsel, the cases are submitted in this court on the evidence taken below, supplemented by some additional data in the form of an exhibit.

In the trial court the cases were tried together and by a stipulation they are so submitted here.

On and before April 18, 1934, Anna Stabler, the plaintiff, appellee, was the owner of certificates of deposit, No. 51897 for $500.00 and No. 50575 for $150.00 on the Peoples Savings and Loan Association of Sidney, Ohio, and certificate No. 34446 on the Shelby County Building and Loan Association of Sidney, Ohio.

On this same date and for some time previous, William L. Stabler was the owner of certificate No. 54355 for $1000.00 on the Peoples Savings and Loan Association of Sidney, Ohio.

On the same date and for some time previous thereto, Raymond Stabler was the owner of pass book No. 22374 for $217.00 on the Peoples Savings and Loan Association of Sidney, Ohio. Prior to the 18th day of April, 1934, there appeared in the classified advertising of the Sidney Daily News the following:

"NOTICE. You need not lose any money on your savings and loan pass books. For further information write J. B. White, 751 First Central Building, Akron, Ohio."

At the time that such publication appeared and for a long time prior thereto, both the Peoples Savings and Loan Association of Sidney, Ohio, and the Shelby County Building and Loan Association of Sidney, Ohio, were on notice. Under the rules of the associations the interest rate had been reduced to 1%. Neither of the associations was paying out anything and there was a general feeling of unrest as to the future value of certificates of deposit claims.

The set up was ideal for the machinations of highpowered salesmen. The advertisement in the newspaper was attracted to and did appeal to the unsuspecting and inexperienced certificate and deposit creditors of the building and loan associations.

On its face it was an untruth, but it caught the eye of these hardworking, industrious and frugal people. The son, Raymond Stabler, wrote a letter in answer to the advertisement to J. B. White at the mentioned Akron address.

Two weeks later, two strangers appeared at the home of the Stablers and immediately conveyed the information that they were there in answer to the letter of young Stabler. These men both very quickly impressed the Stablers with the fact that they paid 100%. They represented Cleveland's Greenlawn Park, which was nothing more than acreage proposed to be convert-

ed into a cemetery with a prospectus in the form of a two fold circular with a cut in the upper left hand corner entitled "Natural Beauty," and in the lower right hand corner another cut entitled "Peaceful Settings," and on the back was another cut stating that it was "A birdseye view when completed." During the course of the interview, it dawned on Mr. Stabler that Greenlawn Park was a cemetery and the particular section to which these salesmen were referring was nothing more than cemetery lots. He gave voice to a very natural expression "What in the hell do I want with cemetery lots in Cleveland."

The response came very quickly, "Oh, you do not get them in lots, we only give them to you as security; you want security, don't you?"

It was further represented that $65,-000.00 was to be expended in making improvements in this so-called Greenlawn Park and that the certificates would be turned over to the contractors. These salesmen stated to the Stablers that the government was intending to take over the building and loans and that when it did only 5 to 15% would be paid to the depositors. The section or lots were so priced as to leave about $150.00 cash coming to the Stablers. They also agreed that they would pay back interest at 6%. Apparently this amounted to about $37.00. The 18th day of April, 1934 was a Wednesday. The Stablers say that the parties were to come back on the following Monday, April 23, at which time all the documents were to be submitted to Mr. Stabler's attorney and if acceptable to the attorney, the deal would go through. How fortunate for the Stablers had nothing further transpired, but unfortunately Mr. and Mrs. Stabler endorsed their certificates in blank on the regular place designated therefor and turned them over to these two salesmen. Raymond Stabler turned over his pass book and according to his testimony he endorsed it. There was also presented in the evidence, as "Exhibit C," a contract purporting to be signed by Mr. Stabler wherein he agreed to purchase lots No. 11½ in lot B in Greenlawn Park Association, a burial ground situated on Dunham Road, Bedford Township, Cuyahoga County, for which he agreed to pay the sum of $2300.00 in savings and loan pass books, etc. Mr. Stabler had no recollection of signing the order, but apparently it is his signature.

Mr. Stabler was given a receipt for the several certificates and pass book and in the receipt was contained the provision that the sale of the lots was subject to acceptance of Greenlawn Park, Inc. If not accepted, the certificates and pass book were to be returned. These two salesmen left the Stabler's home on the farm in Champaign County about 5:30 in the afternoon with the express intention of driving to Piqua, a distance of about fifteen miles.

Early the next morning, which would be April 19, the salesmen appeared in Lima some forty-five miles distant from Piqua at a broker's office for the purpose of selling the certificates.

The deal was completed and all the securities sold to McDonald-Coolidge & Company for the sum of $1820.19. Check was made out to the Greenlawn Park, Inc. on the National Bank of Lima, Ohio. On the same day and possibly before issuing the check, the McDonald-Coolidge & Company transmitted the certificates and deposit book to the associations at Sidney, Ohio, where all the certificates in the Peoples Association and the pass book were turned in and a new pass book No. 22559, issued in the name of A. G. Peterson, for the full value of all certificates and pass book standing in the name of the Stablers. The old certificates and pass book were turned in and marked "paid."

Certificate No. 34446 in the Shelby County Building and Loan Association in the name of Anna Stabler was introduced in evidence. There appears on the back in regular form the signature of Anna Stabler. Above the signature appears the following:

"Sidney, Ohio. 4-19-1934. I hereby assign this certificate to A. G. Peterson."

When this certificate was presented to the Shelby County Association by Mr. Beechler, they struck out the name of Anna Stabler on the face thereof and wrote in the name of A. G. Peterson. A. G. Peterson is claimed to be a nominee of the McDonald-Coolidge & Company. Mr. Peterson is a resident of Lima, Ohio, said to be the father-in-law of Mr. McDonald. It is explained in evidence that the McDonald-Coolidge & Company, Inc., were in the habit of using Mr. Peterson as a nominee in transferring building and loan certificates due to the fact that the building and loan associations generally required a resolution of the Board of Directors before transfers would be made. By having the same transferred to Mr. Peterson they avoided this bothersome requisite. Very quickly the Stablers became suspicious and

consulted their attorney. Action was brought, the petition being filed on Saturday, April 21. It was necessary to bring four actions by reason of the fact that there were three separate parties plaintiff and the further fact that Mrs. Stabler held certificates in two separate building and loans which required that she be plaintiff in two suits.

The defendants were the associations, M. Gordon, Greenlawn Park, Inc., and C. R. Baechler. M. Gordon was one of the two salesmen who procured the securities from the Stablers. The prayer of the petition was that each and all of the several defendants be enjoined from in any manner making any further transfers of the described certificates of deposit; that the same be ordered produced into court; the defendant associations be enjoined from paying any money or in any manner recognizing any title or right in any of the defendants and that such association be ordered to recognize the plaintiff as the true and lawful owner and exclusive owner of the aforesaid certificates, etc.

The defendants in the original petition were the building and loan associations in Sidney, Ohio, and C. R. Baechler, the latter being made a defendant by reason of the allegation that the said Baechler appeared at the office of the building and loan associations and obtained the transfer of the securities on the books of the associations.

Upon the filing of the petition a temporary restraining order was issued. The defendant, Greenlawn Park, Inc., filed answer in one case only.

Plaintiff on June 23, 1934, filed an amended petition and therein A. G. Peterson was also named as a party defendant. McDonald-Coolidge & Company was made a party defendant on its own motion and thereafter filed an answer and cross-petition. A. G. Peterson also filed an answer and cross-petition in substantially the same language as that filed by the McDonald-Coolidge & Company and was represented by the same attorneys. None of the defendants appeared at the trial except McDonald-Coolidge & Company. This answering defendant in effect raised the issue that it purchased the various securities in good faith for value and without any knowledge or information of any defect or infirmity.

Under the state of the record, we would have no difficulty entering drastic orders against the Greenlawn Park, Inc., and their salesman, Mr. Gordon. However, through their speed and action, they have placed themselves beyond the power of this court to make any order in this equitable action. The issue turns solely and entirely on the question as to whether or not the McDonald-Coolidge & Company held the property under their claim of bona fide purchasers for value. Very naturally, we search the record to find whether or not there is present any evidence indicating that McDonald-Coolidge & Company had any knowledge as to the claimed fraudulent conduct of the representatives of Greenlawn Park, Inc., in procuring the securities from the Stablers. Aside from the fact that the McDonald-Coolidge & Company was a branch of a main office located in Cleveland and that Mr. Miller, the president of the Greenlawn Park, Inc., instructed Mr. Gordon to go to Lima for the purpose of disposing of the certificates, we find no evidence upon which to base guilty knowledge. Such knowledge could not be predicated upon the mere fact that both concerns are located in Cuyahoga County, nor, in the absence of any direct evidence, could McDonald-Coolidge & Company be charged with knowledge that the president of Greenlawn Park, Inc., advised his salesman, Mr. Gordon, to sell the securities in Lima. These two isolated events might furnish a lead for further investigation, but evidently counsel for plaintiff were not able to ascertain anything further.

It is an elementary principle of law that fraud is never presumed. We do not have difficulty in determining that the entire scheme of operation through which Greenlawn Park, Inc., acquired the certificates and pass book from the Stablers was fraudulent in its methods. However, we are confronted with an additional issue through the answer and cross-petition of the McDonald-Coolidge & Company. They acquired the securities and paid to Greenlawn Park, Inc., what presumably was the market value thereon. We are unable to find that they had any knowledge of the fraudulent operations of the representatives of Greenlawn Park, Inc.

Under this state of the record, the law of Ohio is defined and well established.

We are confronted with the proposition that neither the certificates nor the pass book are negotiable but rather they were non-negotiable choses in action. We do not find any all inclusive definition of the term "chose in action." There are a great many illustrative determinations as to what are "choses in action." From the sum total we can accurately arrive at the con-

clusion that it includes almost everything except real estate or physical property. In short, a "chose in action" is synonymous to a right of action either in praesenti or in futuro.

"Words and Phrases" gives a most satisfactory explanation as to what the term includes. Counsel for the plaintiff discusses this question and if we understand correctly, urges that the securities in the instant case were qualified "choses in action." Under all the authorities at hand, we are forced to the conclusion that these building and loan securities were unqualified "choses in action." The question at once arises as to how a non-negotiable "chose in action" may be transferred. The answer is that they may be transferred by assignment.

The next question confronting us is whether or not an endorsement in blank constitutes a valid assignment. We at once seek to ascertain if the question has been determined by the Supreme Court of our own state. A careful analysis of the case of **Combs v Chandler et, 33 Oh St 178,** answers the question in the affirmative. The syllabus reads as follows:

"1. A bona fide purchaser, for value, of a non-negotiable chose in action, from one upon whom the owner has, by assignment, conferred the apparent absolute ownership, when the purchase is made upon the faith of such apparent ownership, obtains a valid title as against the real owner, who is estopped from asserting title thereto."

"2. B. makes and delivers his non-negotiable promissory notes to C., from whom they are obtained by fraud, misrepresentation, and without adequate consideration. The assignee, having thus obtained them, transfers them to W., who is a bona fide purchaser, for value, before due without notice: Held, C. can not reclaim the notes from W."

From the syllabus above quoted the nature of the assignment is not disclosed but in a statement of the case, on page 178, we find the following:

"The endorsement when the paper was transferred was merely 'F. A. Combs, guardian'."

In the reported case, it appears that the first assignor who was complaining of the fraud delayed action for some two years and the basis of the court's conclusion might well have been based on this long delay. Wright, J., in delivering the opinion, does state the effective law by reason of the delay, but the syllabus does not seem to buttress the principle announced on this question.

It is well recognized that the syllabus of the case states the law. The opinion is purely dicta. It is always proper to consider the statement of facts as disclosed in the opinion so as to have a clear understanding of what the court had under consideration in formulating the syllabi. A careful reading of the syllabus will disclose that a bona fide purchaser for value of a "chose in action" where there is apparent ownership in the assignee through the action of the assignor, a valid title passes as against the real owner who is estopped from asserting his title. If we were dealing with an original question, we might hold to the view that an endorsement in blank of a "chose in action" would not confer apparent absolute ownership, but when we discover that the judgment and announcement of the law in the Combs case, supra, was based on an endorsement in blank, we are required to follow the decision of our Supreme Court. In 1923 the Supreme Court of Ohio again had under consideration the assignment of a "chose in action." We refer to the case of **Edgar v Haines et, 109 Oh St 159.** At page 167 of the opinion, Chief Justice Marshall, delivering the opinion, uses the following language:

"The instant case is exactly parallel to the case of **Combs v Chandler, 33 Oh St 178,** and upon the authority of that case, as well as upon principle, the judgment of the Court of Appeals must be affirmed."

The third syllabus in the Edgar case reads as follows:

"Where E. transfers to M. a non-negotiable chose in action, which assignment is induced by the fraud of M, and afterwards M transfers the same to K, and K thereafter assigns the same to S, all of which transfers are by indorsement and delivery and both K and S pay a valuable consideration therefor without notice or knowledge of the fraud of M, the equities of S are superior to those of E, and the situation is a proper one for the application of the legal maxim that, where one of two innocent persons must sustain a loss from

the fraud of a third, such loss must fall upon the one, if either, whose act has enabled such fraud to be committed."

The Court of Appeals of the Eighth District also had the question under consideration in the case of **Hopple v Cleveland Discount Company, 25 Oh Ap 138 (6 Abs 41).** Syllabus 6 reads as follows

"6. Where an instrument is in nature of a chose in action, bona fide purchaser takes it free from collateral equities, notwithstanding fact that he may be subject to defenses by obligor to which original owner was subject."

Of course, the obligor mentioned is not the endorser in the instant case. The obligor would be the building and loan associations. Syllabus 8 in the Hopple case reads as follows:

"8. Indorsements in blank by payee of interim certificates, and delivery thereof to another for valuable consideration, was sufficient to transfer title to certificates, which could not be rescinded after transferee sold certificates to innocent purchaser for value."

Counsel for plaintiff raise the further proposition that under the valid terms of the securities in the instant case, they were only transferable on the books of the company.

It is urged that this constituted a contract and that the defendants, the building and loan associations, were negligent in making the transfers in the absence of the owners, the Stablers. The pertinent provision on the back of the certificates of the Peoples Savings Association reads as follows:

"This certificate is transferable only on the books of the association."

We are confronted with the situation that the certificates were transferred on the books of the association prior to plaintiffs' filing their actions. The certificates and pass book were all marked paid and the new obligation was issued by the building and loan association to A. G. Peterson, said to be the nominee of the cross-petitioner, McDonald-Coolidge & Company. The certificate in the Shelby County Building and Loan Association contained the following provision on the back thereof:

"This certificate is transferable only on the books of the association and the surrender thereof at the office of the association in person or by a duly authorized agent or attorney of the owner."

The only distinction to be raised in the two cases was that insofar as the Peoples Savings and Loan Association securities are concerned there was a legal assignment, whereas the assignment of the Shelby County Building and Loan Association would constitute an equitable assignment. The legal effect would not differ for the reason that in both instances a bona fide purchaser for value without notice would acquire the superior right.

The further question is raised that the Greenlawn Park, Inc., being a corporation organized and created for cemetery purposes, would not have the right to accept building and loan certificates in payment for cemetery lots. In other words, that they would be limited in their sale of lots to payment in cash. It is unquestionably true that all corporations are limited in the general scope of their business, in the doing of things authorized under their charter. It is unquestionably true that the cemetery association incorporated could not enter a brokerage business in dealing in stocks or other securities. However, we do not think there would be any violation of their charter rights in accepting payment through building and loan certificates, particularly where such certificates have a market value. Any ultra vires act would be grounds for cancelling the charter by the State. It very frequently happens that corporations going beyond the limits of their charter rights are required to purge themselves by immediately disposing of any property they may hold in violation of their charter. Whatever might be said as to the act of the Greenlawn Park, Inc., being ultra vires, we do not think that this could in any way affect the position of McDonald-Coolidge & Company. There is nothing in the record to disclose that McDonald-Coolidge & Company had knowledge that Greenlawn Park, Inc., was a cemetery organization. It is true the check in payment of the stock was made directly to Greenlawn Park, Inc. There is nothing in the name indicating the nature of the business.

We can not close this opinion without volunteering the comment that we do hope our citizens will awaken to the fact that

for their own protection they should not sign their name and deliver their property to strangers. We have the deepest sympathy for the plaintiffs in this action. We have worked many long hours in an effort to find some means of affording relief. The Supreme Court having defined the rights of parties under situations of this kind, we are powerless to do anything but follow such precedents.

The petition of the plaintiff will be dismissed without prejudice to any action at law it may desire to bring against Greenlawn Park, Inc., or Mr. Gordon. The entry may determine that the rights of the McDonald-Coolidge & Company as against the plaintiffs are absolute.

Exceptions will be allowed.

BARNES, PJ, HORNBECK and GEIGER, JJ, concur.